751 So.2d 823 (1999)
Claude M. PENN, Jr., Gladney L. Manuel, Jr., Feliciana Ventures, Inc., and Manuel's I-10 Auto & Truck Stop, Inc.
v.
STATE of Louisiana, through The Honorable Murphy J. FOSTER, Jr., Governor, The Honorable Richard P. Ieyoub, Attorney General, The Supervisory Committee On Campaign Finance Disclosure And The Department Of Public Safety and Corrections, Louisiana Gaming Control Board.
No. 99-CA-2337.
Supreme Court of Louisiana.
October 29, 1999.
Rehearing Denied November 24, 1999.
Richard P. Ieyoub, Atty. Gen., Maris LeBlanc McCrory, R. Gray Sexton, L. Rand Dennis, Kathleen M. Allen, Counsel for Applicant.
Frank D. Blackburn, Brett A. Sulzer, Counsel for Respondent.
PER CURIAM.[*]
In May 1999, plaintiffs, holders of video draw poker licenses, filed suit against the State of Louisiana, challenging certain statutes passed in the 1996 legislative session which restricted their right to contribute to candidates or political committees of candidates. The district court declared unconstitutional "LSA-R.S. 18:1505.2(L)(3)(a)(i), LSA-R.S. 18:1505.2(L)(3)(b)(i) insofar as it is applied *824 to LSA-R.S. 18:1505.2(L)(3)(a)(i), and Rule 107 of Title 42 of the Louisiana Administrative Code, insofar as Rule 107 precludes candidate and political committee contributions by video draw poker licensees." The district court also permanently enjoined the defendants from enforcing these provisions. The State suspensively appealed that judgment to this Court pursuant to La.Const. Art. V, § 5(D).
Although the provisions at issue were enacted in 1996, plaintiffs did not file suit until May 1999, and the appeal did not reach this Court until August 199. The case was heard and submitted for decision on September 7, 1999.
We hereby render judgment on this date, consisting of this decree and the concurring and dissenting opinions by the justices on this panel.

DECREE
The judgment of the district court is AFFIRMED. LSA-R.S. 18:1505.2(L)(3)(a)(i), and LSA-R.S. 18:1505.2(L)(3)(b)(i) insofar as it applies to LSA-R.S. 18:1505.2(L)(3)(a)(i), are declared unconstitutional under the First and Fourteenth Amendments to the United States Constitution.[2] Rule 107 of Title 42 of the Louisiana Administrative Code, insofar as it precludes candidate and political committee contributions by video draw poker licensees, is likewise invalid, and defendants are permanently enjoined from enforcing the Rule.
JOHNSON, J., CALOGERO, C.J., and LEMMON and KIMBALL, JJ., concur and assign reasons.
VICTORY AND KNOLL, JJ., dissent and assign reasons.
TRAYLOR, J., dissents for the reasons assigned by VICTORY and KNOLL, JJ.
JOHNSON, J., concurring.
During the First Extraordinary Session of 1996, the Louisiana Legislature passed Act 67 which enacted La.Rev.Stat. § 18:1505.2(L) relative to campaign finance. The provisions of La.Rev.Stat. § 18:1505.2(L) prohibit certain persons from making campaign contributions, loans, or transfers of funds to any candidate, any political committee of any such candidate, or any other political committee which supports or opposes any candidate. By enacting the provisions of La.Rev.Stat. § 18:1505.2(L), the legislature intended to promote confidence in the electoral process, and protect candidates and the election process from both real and perceived influence by special interests, particularly persons involved in the gaming industry of this state. The statute impacts persons holding a license or permit to distribute, manufacture, or service gaming devices and persons who own truck stops or licensed pari-mutuel or off-track wagering facilities that are licensed device establishments. Any person who has more than a ten percent interest directly, or a twenty-five percent interest indirectly, in any of the aforementioned legal entities is affected by the statute. The portions of La.Rev. Stat. Ann. § 18:1505.2(L) pertinent to the resolution of this case provide:
(1) The legislature recognizes that it is essential to the operation of effective democratic government in this state that citizens have confidence in the electoral process and that elections be conducted so as to prevent influence and the appearance of influence of candidates for public office and of the election process by special interests, particularly by persons substantially interested in the gaming industry in this state.
(2) No person to whom this Subsection is applicable as provided in Paragraph (3) of this Subsection shall make a contribution, *825 loan, or transfer of funds, including but not limited to any in-kind contribution, as defined in this Chapter, to any candidate, any political committee of any such candidate, or to any other political committee which supports or opposes any candidate.
(3) This Subsection shall be applicable to all of the following:
(a)(i) Any person who holds a license or permit as a distributor of gaming devices, who holds a license or permit as a manufacturer of gaming devices, who holds a license or permit as a device service entity, and any person who owns a truck stop or a licensed pari-mutuel or off-track wagering facility which is a licensed device establishment, all pursuant to the Video Draw Poker Devices Control Law.
* * * *
(b)(i) Any person who has an interest, directly or indirectly, in any legal entity included in Subparagraph (a) of this Paragraph. "Interest", as used in this Subparagraph means ownership by an individual or his spouse, either individually or collectively, of an interest which exceeds ten percent of any legal entity. An indirect interest is ownership through any number of layers of legal entities when twenty-five percent or more of each legal entity is owned by the legal entity ownership beneath it.
The present litigation also challenges Emergency Rule 107 as promulgated by the Louisiana Gaming Control Board in August, 1996. The Rule provides standards of conduct and ethical rules for members of the Gaming Control Board, their family members, employees of the Board, and all licensees of the Board. In pertinent part it provides:
6.b. No casino operator or any other licensee or permittee shall make a contribution or loan to, or expenditure on behalf of, a candidate or committee.
La. Admin. Code tit. 42, § 107.
The plaintiffs in this matter are persons who own truck stops licensed under the Video Draw Poker Devices Control Law as device establishments. They contend that La.Rev.Stat. Ann. § 18:1505.2(L)(3)(a)(i), La.Rev.Stat. Ann. § 18:1505.2(L)(3)(b)(i), and La. Admin. Code tit. 42, § 107 are violative of the First and Fourteenth Amendments of the United States Constitution, the equal protection provisions of Art. I, § 3 of the Louisiana Constitution, the freedom of expression and right of assembly and petition provisions in Art. I, §§ 7 and 9 of the Louisiana Constitution. Other persons prohibited from making campaign contributions by La.Rev.Stat. Ann. § 18:1505.2(L) have not joined in this litigation.[1]
*826 Louisiana is one of eight states which has enacted a ban on campaign contributions by the gaming industry.[2] The most recent expression by this Court on restrictions in the gaming industry came in Brown v. State Through Dept. of Public Safety, 96-2204 (La.10/15/96), 680 So.2d 1179, addressing the constitutionality of La.Rev.Stat. Ann. § 27:13(C)(6). In declaring the statute unconstitutional, we concluded that the prohibition on contributions to committees supporting or opposing ballot measures suppressed the free flow of information protected by the First Amendment. Id., p. 10, 680 So.2d at 1183. This case presents the question left unanswered in Brown, that is whether the First Amendment protects campaign contributions to individual candidates and committees supporting or opposing those candidates.
The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this most important guarantee applicable to the states as well as the Congress. This guaranteed freedom of speech is essential to our society and a basic element of our fundamental law. The jurisprudence recognizes that the First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). Commitment to this principle lends itself to the protection of campaign contributions and political speech.
The United States Supreme Court's decision in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), marks the inception of modern campaign finance jurisprudence, and is the seminal case on campaign contributions and expenditures in the context of First Amendment rights. It is only fitting that the resolution of this case start with Buckley. In addressing the contribution and expenditure limitations imposed by the 1974 amendments to the Federal Election Campaign Act of 1971, the Buckley Court concluded that limitations on campaign contributions do not violate the First Amendment of the Constitution. However, limitations on expenditures were found to be violative of First Amendment rights. In reaching this conclusion, the Court recognized that:
The Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)..... As the Court observed in Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."
Id., at 14-15, 96 S.Ct. at 632.
The Court equated contributing and expending funds with political expression and *827 determined that limitations on these activities implicate First Amendment rights:
A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.
Buckley, 424 U.S. at 19, 96 S.Ct. at 634-35 (footnotes omitted). Further, the contribution and expenditure limitations also bear upon the freedom of association:
Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals. The Act's contribution ceilings thus limit one important means of associating with a candidate or committee....
Id. at 22, 96 S.Ct. at 636.
In this case, we are faced with statutory provisions that prohibit, as opposed to limit, contributions. Buckley recognized that placing limits on the amount that any one person or group may contribute to a candidate has a marginal restriction on that contributor's ability to engage in free communication. 424 U.S. at 20, 96 S.Ct. at 635. However, the persons included in La.Rev.Stat. Ann. §§ 18:1505.2(L)(3)(a)(i), 18:1505.2(L)(3)(b)(i), and La. Admin. Code tit. 42, § 107 are not allowed to engage in free communication, nor are they allowed to affiliate with a candidate by making a contribution. Clearly these prohibitory provisions impinge upon First Amendment rights. Thus, the State's enactment of these provisions must withstand strict scrutiny in order to be upheld.
The State argues that Buckley does not require strict scrutiny for contribution limits, but only requires that limits be "closely drawn" to further a "sufficiently important" interest. The analysis employed in Buckley, while using different terms, still requires that the government meet an exacting standard to justify interfering with the right to participate in political activities. Further, the fact that the State has completely removed the right to contribute evidences far more interference than the marginal restriction recognized in Buckley.
"[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Department of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). A restriction on political speech must be subjected to the most exacting scrutiny, thus, requiring a showing that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); See also, Colorado Republican Fed. Campaign Comm. v. Fed. Election Commission, 518 U.S. 604, 640-642, 116 S.Ct. 2309, 2328, 135 L.Ed.2d 795 (1996) (Thomas, J., dissenting) ("Curbs on protected speech, we have repeatedly said, must be strictly scrutinized."); Citizens Against Rent Control v. Berkeley, 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981) ("Regulation of First Amendment rights is always subject to exacting judicial review.")
Heretofore, the United States Supreme Court has identified one compelling governmental interest that justifies restrictions on campaign financing: "to limit the actuality and appearance of corruption resulting from large individual financial contributions." Buckley, 424 U.S. at 26, 96 S.Ct. at 638. As the Court explained, the prevention of actual corruption and the appearance of corruption is necessary to preserve our system of democracy:
Under a system of private financing of elections, a candidate lacking immense personal or family wealth must depend on financial contributions from others to *828 provide the resources necessary to conduct a successful campaign. The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy. To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined....
Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual contributions.... Here ... Congress could legitimately conclude that the avoidance of the appearance of improper influence "is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent."
Id. at 26-27, 96 S.Ct. at 638-39 (citations and footnotes omitted).
Since Buckley, the decisions rendered by the United States Supreme Court in the area of campaign finance further explain permissible regulation of campaign contributions and expenditures. The Court has found no danger of corruption in independent expenditures by political action committees ("PACs") or political parties to justify limitations. See Colorado Republican, 518 U.S. at 618-19, 116 S.Ct. at 2309. Restrictions on individual contributions relating to initiative campaigns where there is no danger of an improper quid pro quo have been invalidated. See Citizens Against Rent Control, 454 U.S. at 298-300, 102 S.Ct. at 438-39. However, the Court upheld restrictions on indirect contributions to candidates, such as contributions to PACs. See California Medical Ass'n v. Federal Election Comm'n, 453 U.S. 182, 197-99, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). The corporate right to political expression was expanded with the invalidation of restrictions on corporate expenditures relating to ballot initiatives. See First National Bank v. Bellotti, 435 U.S. 765, 784, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). In 1990, the Court upheld restrictions on independent expenditures by corporations finding "the unique state-conferred corporate structure that facilitates the amassing of large treasuries warrants the limit on independent expenditures." See Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 660, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). Corporations are still allowed to express their political views through independent expenditures. The Michigan Act simply requires corporations to set-up separate segregated funds for political purposes. Additionally, nonbusiness, political corporations that are formed to promote political ideas, have no shareholders, and are independent from the influence of business corporations are protected from campaign finance limitations. See Federal Election Comm'n v. Massachusetts Citizens for Life, 479 U.S. 238, 263-64, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986).
In the present matter, the State contends that the provisions of La.Rev.Stat. Ann. § 18:1505.2(L) are necessary to dispel the perception that the gaming industry is associated with political corruption; and, therefore, justifies the abridgement. Admittedly, the prevention of corruption justifies limitations on campaign contributions for individuals and corporations. But, here, the right to contribute has not been limited; the right has been removed. The jurisprudence has recognized no justification for removing the right to contribute. This Court has previously determined that the State may not restrict contributions to political committees organized to communicate ideas under the guise of preventing corruption. See Brown v. State Through Dept. of Public Safety, 96-2204 (La.10/15/96), p. 10; 680 So.2d 1179, 1183. In Brown, we stated that "[t]he corruption rationale only applies *829 to candidate or candidate committee limitations." Id., citing Citizens Against Rent Control, 454 U.S. at 297, 102 S.Ct. at 438. The State asks that we now extend the corruption rationale to justify excluding entire categories of persons from the political process.
The State posits an actual and a perceived threat of corruption in the gambling industry because of the history of the industry in this State. While we are not blind to Louisiana's history of corruption in the gambling industry, the State offers no support for its contention that these prohibitions will prevent corruption. In defending a regulation that abridges First Amendment interests, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 2470, 129 L.Ed.2d 497 (1994). Here, the State has failed to meet this standard in defending the contribution ban.
Moreover, Buckley and its progeny recognized that it is the large contributions that threaten to undermine the integrity of our system of representative democracy. Buckley, at 26-27, 96 S.Ct. at 638-39. Fixing campaign contribution limits addresses this concern in a direct and material way. Here we are not faced with the threat of large contributions being given by the video poker licensees to secure a political quid pro quo because Louisiana's statutory campaign contribution limitations address this concern. See La.Rev.Stat. Ann. § 18:1505.2(H)(1)(a). Under the provisions of 18:1505.2(H)(1)(a), contributions for major offices are limited to $5,000; district offices are limited to $2,500; and other offices are limited to $1,000. As such, no video poker licensee, or any other entity, could contribute more money to a candidate or candidate committee than the set limits.
The State also contends that the revenue generated by the video poker industry heightens the perception of corruption associated with the industry. For the fiscal year ending June 30, 1998, the video gaming industry generated $653,375,000 in net gaming proceeds from the devices, and for the fiscal year ending June 30, 1997, the industry generated $618,477,000 in net proceeds.
While these figures would seem to indicate vast accumulations of wealth within the video poker industry, the State's argument overlooks two important considerations. First, the figures relied upon to illustrate the vast revenues held by the video poker industry are the amounts received before the payment of franchise fees to the State. Depending on the type of establishment, these franchise fees range from 22.5% to 32.5% of net proceeds.[3] Thus, of the $653,375,000 generated in 1998, $183,579,000 was paid to the State in franchise fees, leaving a total of $469,796,000 in actual proceeds.[4] The second consideration overlooked is the fact that there are industries in this State that generate revenue far in excess of the sums generated by the video poker industry. The plaintiffs point out that in the list of the top 50 Louisiana companies ranked by net income for 1998, not a single gaming entity is listed. Plaintiffs' Brief, p. 10. Moreover, the top ranked company on the list, Entergy, had net income of $789,500,000 in 1998, far in excess of the entire *830 video poker industry.[5] Plaintiffs' Brief, Exhibit E, Special Report: Louisiana Inc.: The Pelican State's Top 50 Stocks, Top 50 By Net Income, Times-Picayune (New Orleans, May 16, 1999, at K18). Further, the State has offered no proof that money from the video poker industry is more influential than money from any other special interest group.
More glaring is the exclusion of certain groups under this statutory scheme. The statutes prohibit contributions by distributors, manufacturers, service entities, parimutuel facilities, off-track wagering facilities, and truck stops. However, owners of the devices, bars, restaurants, lounges, and clubs are not subject to the prohibition. The threat of actual or perceived corruption would seem to apply as well to actual owners of video poker devices, yet the statute singles out the persons licensed to service, manufacture, and distribute the devices.
For example, the record contains the affidavit of William L. Hall, a device owner who owns and operates approximately 120 video poker devices at various locations in the state, and is not prohibited from making contributions under La.Rev.Stat. Ann. § 18:1505.2(L)(3)(a)(i) or (b)(i). The exclusion of owners from the statute, who are free to own an unlimited number of devices, seems to defeat the stated purpose of preventing corruption.
Likewise, the failure to include restaurants, lounges, and bars in the prohibition contravenes the State's expressed intent. The State contends the statute does not include these locations because these facilities are limited to three devices per establishment. See La.Rev.Stat. Ann. § 27:306(A)(2). In contrast, there is no limit on the number of devices which may be placed at off-track wagering and pari-mutuel facilities, and truck stops may operate up to 50 devices. See La.Rev.Stat. Ann. § 27:306(A)(3)-(4)(a). Presumably, the more devices a facility is allowed to have, the greater the possibility for corruption. The flaws in this reasoning are made evident when considered with the assertion that the perception of corruption is heightened for the video poker industry because of the high revenues generated by the industry. If the perception of corruption increases with the amount of revenue generated, then the amount of revenue should be the factor for determining inclusion in La.Rev.Stat. Ann. § 18:1505.2(L)(3)(a)(i) and (b)(i), not the number of machines a facility is allowed to have. The included facilities, truck stops, off-track wagering facilities, and pari-mutuel facilities, generated net proceeds of $249,459,000 in fiscal year 1997-1998. While the excluded facilities, restaurants, lounges, and hotels/motels, generated net proceeds of $403,916,000 in fiscal year 1997-1998. If the State's theory is correct, then the perception of corruption should be greatest with the facilities excluded from the statutory prohibition.
The State's final contention, that in exchange for the privilege of obtaining a license to engage in gaming activities, a licensee is obliged to forego limited political rights, is also untenable. In Posadas de Puerto Associates v. Tourism Co. of Puerto Rico, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), the Court stated that "the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling." 478 U.S. at 345-46, 106 S.Ct. at 2979. This proposition, which supports the State's contention, was addressed again by the Court in 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S.Ct. *831 1495, 134 L.Ed.2d 711 (1996). There the Court stated:
As a matter of First Amendment doctrine, the Posadas syllogism is even less defensible. The text of the First Amendment makes clear that the Constitution presumes that attempts to regulate speech are more dangerous than attempts to regulate conduct. That presumption accords with the essential role that the free flow of information plays in a democratic society. As a result, the First Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another means that the government may use to achieve its ends.
* * * *
Even though government is under no obligation to provide a person, or the public, a particular benefit, it does not follow that conferral of the benefit may be conditioned on the surrender of a constitutional right.
Id. at 510, 116 S.Ct. at 1512-1513 (footnotes omitted).
Acceptance of a video poker license does not require the relinquishment of First Amendment rights to speech and association. Similarly, the State's attempt to support this argument with the jurisprudence upholding federal and state limitations on employee political activity is unpersuasive. While it is true that the acceptance of government employment carries with it the relinquishment of certain political rights, the jurisprudence recognizes a distinction in the manner in which the government can regulate its employees and private citizens. The United States Supreme Court has stated that "[government] may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." U.S. v. National Treasury Employees Union, 513 U.S. 454, 464, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995). No such distinction is recognized for private citizens receiving a particular benefit from the government. Accordingly, the State's argument must fail.
This absolute ban on political contributions by a particular segment of society goes far beyond what Buckley endorsed. The First Amendment simply does not allow the State to target groups and exclude them from the political process. I am convinced that the broad prophylactic measures in La.Rev.Stat. Ann. § 18:1505.2(L)(3)(a)(i); La.Rev.Stat. Ann. § 18:1505.2(L)(3)(b)(i), insofar as it is applied to La.Rev.Stat. Ann. § 18:1505.2(L)(3)(a)(i), and La. Admin. Code tit. 42, § 107, insofar as it precludes candidate and political committee contributions by video draw poker licensees, are unconstitutional under the First and Fourteenth Amendments of the United States Constitution.
CALOGERO, C.J., concurring.
The provisions at issue in this case,[1] La. R.S. 18:1505.2(L)(3)(a)(i), La. R.S. 18:1505.2(L)(3)(b)(i), and Rule 107 of Title 42 of the Louisiana Administrative Code ("the Louisiana statutes"), prohibit some, but not all, persons associated with the video draw poker industry, from making a contribution, loan, or transfer of funds to any candidate for state or local public office.[2] The prohibition applies whether *832 the contribution, loan, or transfer of funds is given directly to the candidate, to any political committee of the candidate, or to any committee supporting or opposing a specific candidate. See La. R.S. 18:1502.2(L)(2). Further, the term "candidate" is broadly defined to include any person seeking nomination or election to public office, with the exception of several enumerated federal offices. See La. R.S. 18:1483(3)(a). In sum, those video draw poker licensees affected by the Louisiana statutes cannot contribute to any candidate in any state or local election.[3]See id.
All parties to this suit agree that legislation, such as the Louisiana statutes, which sets limits on the amount of money that an individual can contribute to a candidate, operates in an area subject to First Amendment protection. The State, however, argues that the Louisiana statutes are constitutional, i.e., not in violation of the First Amendment, because in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), the United States Supreme Court upheld limits on contributions to candidates. According to the State, Buckley holds that "limiting the actuality and appearance of corruption is a sufficiently important governmental purpose to justify limitations on contributions." Thus, because the public associates gambling and gaming with corruption, say the defendants, the Louisiana statutes are a permissible infringement on First Amendment rights under Buckley.
After a review of the Buckley decision as well as the applicable campaign finance jurisprudence, I conclude that the prohibition on contributions in the Louisiana statutes exceeds the permissible infringement on First Amendment rights recognized by the Court in Buckley. Consequently, the Louisiana statutes are unconstitutional because they violate the First and Fourteenth Amendments of the United States Constitution.[4]
In Buckley, the United States Supreme Court held that campaign contributions are a type of political expression entitled to First Amendment protection. Buckley, 424 U.S. at 14, 96 S.Ct. at 632. Nevertheless, the Buckley Court upheld federal legislation that set ceiling limits on the amount of money that any one individual could contribute to a specific candidate for certain federal offices. Id. at 29, 96 S.Ct. at 640. In upholding the contribution limits at issue in Buckley, the Court identified a single "compelling governmental interest" sufficient to outweigh the burden on First Amendment rights caused by contribution limits: curtailing the actual or perceived corruption of our electoral process that can result when an individual contributor gives a large sum of money to *833 a specific candidate. Id. at 26-27, 96 S.Ct. at 638. The crux of the Court's reasoning in upholding the limits was the potentially coercive influence that large financial contributions can have on the candidate's actions if elected to office. The Court characterized this as "quid pro quo arrangements" and concluded that this specific type of corruption, i.e., the "purchasing of a candidate" by way of a large contribution, was so potentially injurious to our "representative democracy" as to justify the contribution limits at issue. Id.[5]
To date, the Court has not expanded the scope of the permissible infringement on First Amendment rights that it created in Buckley when it upheld the contribution limits at issue in that case. To the contrary, in the campaign finance cases that follow Buckley, the Court has made clear that Buckley was a very "narrow exception" justified only by the quid pro quo/large contribution type of corruption discussed above. See Citizens Against Rent Control v. Berkeley, 454 U.S. 290, 296, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981) ("Buckley identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment."); Colorado Republican Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 640, 116 S.Ct. 2309, 2328, 135 L.Ed.2d 795 (1996) (Thomas, J., concurring in judgment and dissenting in part) (stating that Buckley's analysis was "deeply flawed" and campaign contributions should receive full First Amendment protection); California Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182, 202, 101 S.Ct. 2712, 2725, 69 L.Ed.2d 567 (1981) (Blackmun, J., concurring in part and concurring in the judgment) ("[It is] a mistaken view that contributions are `not the sort of political advocacy ... entitled to full First Amendment protection.'"). In sum, campaign contribution limits aimed at defeating corruption, as the Louisiana statutes purport to do, must fit within the exception created by Buckley in order to pass constitutional muster. The exception created by Buckley permits the State to set reasonable limits, applicable to all persons, on campaign contributions, for the sole purpose of reducing the corruption that may result when contributors give large financial contributions in exchange for political favors, i.e., political quid pro quo arrangements. Otherwise, according to Buckley and its progeny, campaign contributions are a type of political expression protected by the First Amendment.
Turning now to the Louisiana statutes at issue in this case, it is clear that they do not fit within the "narrow exception" recognized in Buckley. First of all, the Louisiana statutes impose a complete prohibition on contributions which prevents the affected parties from giving any financial support directly to a candidate. Buckley, on the other hand, upheld setting reasonable limits on contributions in order to prevent any one individual from giving too large a contribution. Although the permissibility of a prohibition, rather than a limit, was not before the Buckley Court, the reasoning employed by the Court in upholding contribution limits makes clear that a complete prohibition cannot be acceptable. Specifically, the Court reasoned that it was the symbolic act of contributing to a candidate that constituted political expression, and that the expression encompassed in the act of contributing was unrelated to the size of the contribution. Buckley, 424 U.S. at 21, 96 S.Ct. at 635-36. Thus, because the size was not as important as the act of contributing itself, a legislatively imposed limit on size was merely a "marginal restriction" on First *834 Amendment rights that was outweighed by the government's interest in preventing political quid pro quo corruption. See id. at 20, 96 S.Ct. at 635.
A prohibition on contributions, however, does not mesh with this reasoning because the contributor can no longer engage in the symbolic act of making a financial contribution. Unlike a limit which only restricts the size of the contribution but leaves the act of contributing unaffected, a prohibition cuts off all expression associated with making a contribution to a candidate. Therefore, a complete prohibition cannot be characterized as a "marginal restriction" under the Buckley Court's reasoning.[6]
Second, the Louisiana statutes were not enacted to serve the sole "compelling interest" recognized in Buckley: preventing corruption of the electoral process by political quid pro quo arrangements with large contributors. Rather, the Louisiana statutes were enacted to prevent a group, which the public historically has associated with corruption, from exerting influence in any state or local election by way of a contribution to a candidate.[7] The State asserts that the public perceives that the electoral process is corrupted when groups that it associates with corruption contribute to candidates running for elected positions.
Once again, without conceding the validity of this reasoning, the effect on the electoral process caused by one group that the public perceives as "corrupt" is not the type of corruption that Buckley recognized as a governmental interest sufficient to justify contribution limits. Nothing in Buckley, or any of the cases that followed, suggests that the State can target unpopular groups in order to suppress their political expression. Again, Buckley defined "corruption" very narrowly to be political quid pro quo arrangements which might arise from large contributions, and nothing more. Nothing in the later cases suggests a broader meaning. In short, it is not enough to say that Buckley allows the State to set limits in order to prevent corruption, unless one clarifies that the corruption at issue is from quid pro quo arrangements resulting from large contributions. That is simply not what the Louisiana statutes purport to do.
Moreover, the Louisiana statutes cannot, as a practical matter, serve the "compelling interest" of preventing corruption from large contributions because Louisiana already has in place general campaign finance laws that limit the amount of money that any video draw poker licensee, or any other person for that matter, can contribute to a candidate. See La. R.S. 18:1505.2(H).[8] Because of the limits set in *835 La. R.S. 18:1505.2(H), the large contributions which were key to the Buckley decision are not present in this case. Video draw poker licensees covered by the prohibitions at issue here, as well as other members of the gaming industry, can contribute no more to a candidate than any other citizen. Thus, the State's interest in preventing the single type of political corruption that Buckley identified as an interest sufficient to outweigh First Amendment rights, i.e., political quid pro quo arrangements resulting from large contributions, is not present in this case.
The State asserts, however, that the large revenues collected as a whole by the gaming industry would allow its members to disproportionately affect the political process if they are allowed to contribute to candidates. However, while Buckley permits the State to alleviate undue influence on candidates by virtue of individual large contributions, it does not allow the State to set limits, or, even more so, prohibitions, in order to prevent the influence that any one group could potentially assert by collectively contributing to a candidate. See First Nat'l Bank v. Bellotti, 435 U.S. 765, 790, 98 S.Ct. 1407, 1423, 55 L.Ed.2d 707 (1978) ("[T]he fact that advocacy may persuade the electorate is hardly a reason to suppress it."); Buckley, 424 U.S. at 48-49, 96 S.Ct. at 649. In short, while the First Amendment does not protect the contributor's right to give a candidate a contribution of unlimited size, it does protect the right of the individual to contribute to the candidate of his choice without regard to whether he is one of many persons whose interests are the same as his own.
Another difference between the Louisiana statutes and the ones upheld in Buckley is that the Buckley statutes were applicable to the entire citizenry. That is, all potential campaign contributors were subject to the limits upheld in Buckley, and no one group or industry was singled out.[9]
The Louisiana statutes at issue in this case, on the other hand, do not apply to all potential contributors to candidates for elective office. Rather, they target a specific group of allegedly unpopular individuals among our citizenry. The undisputed purpose of the Louisiana statutes is to suppress the potential political influence specific to that one group. See La. R.S. 18:1505.2(L)(1). However, the idea that the government can identify unpopular groups and pass legislation aimed at suppressing their political influence is one foreign to the First Amendment of our Constitution. 44 Liquormart, 517 U.S. at 501, 116 S.Ct. at 1507 (recognizing the dangers associated with governmental attempts to single out certain messages for suppression); see Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("[A]bove all, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content...."). Therefore, because the Louisiana statutes single out one group for different treatment under the First Amendment, they are fundamentally different in nature from those upheld by the Buckley Court.
However, the State, as well as the dissenting justices of this Court, argue that the gaming industry is unique because of its long history of opprobrium in this State, and the public's long-held perception that gambling is associated with corruption. They also cite two state court cases, Petition of Soto v. State, 236 N.J.Super. 303, 565 A.2d 1088 (1989), and Schiller *836 Park Colonial Inn, Inc. v. Berz, 63 Ill.2d 499, 349 N.E.2d 61 (1976), because those cases relied on Buckley to uphold prohibitions on members of so-called "vice" industries that those courts recognized as unique.[10]
After a careful review of the Soto and Schiller Park cases, I find them unpersuasive for two reasons. First, even though both cases relied on Buckley to uphold prohibitions on contributions instead of limits, neither court adequately explained how a prohibition could be acceptable under Buckley's reasoning. For example, when the Schiller Park court addressed the permissibility of a complete prohibition, it simply quoted the portion of the Buckley opinion that addressed why a limitation was a "marginal restriction." Schiller Park, 349 N.E.2d at 66 (quoting Buckley, 424 U.S. at 20-21, 96 S.Ct. at 635). It then concluded that a prohibition was acceptable because the Illinois legislature could have reasonably believed that a limitation would not have been as effective as a complete prohibition. Id. Therefore, while the Schiller Park court faced issues very similar to the ones raised in this case, the reasoning employed by that court in upholding the prohibitions at issue is not very helpful.[11]
As for the Soto case, that court relied on Schiller Park's questionable application of Buckley to uphold the prohibitions in that case. Soto quoted extensively from Schiller Park before following Schiller Park's example and giving deference to its own legislature's determination that a prohibition was a necessary measure. Soto, 565 A.2d at 1098-99. Simply said, neither Soto nor Schiller Park is very useful in explaining one of the key differences between the Buckley statutes and the Louisiana statutes, i.e., the permissibility of a complete prohibition on contributions as opposed to a limitation. While cases from other courts are useful in determining similar issues faced by this Court, those cases are only persuasive to the extent that they are backed by solid reasoning consistent with binding constitutional authority such as the United States Supreme Court's decision in Buckley.
Second, and most significantly, the United States Supreme Court's recent decision in 44 Liquormart casts more doubt on the reasoning employed by the Soto and Schiller Park courts. Both of the latter courts looked to the nature of the industries involved when concluding that the government's asserted interest was sufficient to outweigh the infringement on *837 First Amendment rights caused by the prohibitions at issue in those cases. See Schiller Park, 349 N.E.2d at 65 (stating that the business of selling liquor was "related to certain evils in society"); Soto, 565 A.2d at 1104 (stating that crime and corruption are inherent in the casino industry). However, in 44 Liquormart, the Court unequivocally rejected the proposition that certain products, activities, or industries are entitled to less protection under the First Amendment because of their history as "vice" activities. See 44 Liquormart, 517 U.S. at 513-14, 116 U.S. at 1513 (rejecting the state's argument that commercial speech protected under the First Amendment is subject to a "vice" exception). The Court recognized the danger inherent in giving legislatures the discretion to categorize certain activities as "vices" for the purpose of suppressing expression. Id. ("Almost any product that poses some threat to public health or public morals might reasonably be characterized by a state legislature as relating to `vice activity.'").
Furthermore, the Court's refusal in 44 Liquormart to create a "vice" exception to the First Amendment is especially significant because the restriction at issue in that case operated in the area of commercial speech, an area entitled to less protection under the First Amendment than other forms of speech. Surely, if the Court would not recognize a "vice" exception in the lesser protected area of commercial speech, then a "vice" exception cannot be acceptable for campaign contribution regulations which the Court has held "operate in an area of the most fundamental First Amendment activities." Buckley, 424 U.S. at 14, 96 S.Ct. at 632. Simply said, in the wake of 44 Liquormart, the arguments of the State and dissenting justices of this Court, which cite gambling's history of perceived corruption as justification for the Louisiana statutes, are questionable.
However, my dissenting colleagues make an argument under our State Constitution which at first glance seems, potentially at least, to aid the defendants. They point out that, under the Louisiana Constitution, the legislature is charged with defining and suppressing gambling, and that the prohibition on campaign contributions in the Louisiana statutes is merely one of the means employed by our legislature while acting pursuant to its constitutional duty to suppress gambling. One of the dissents also cites various cases from this Court which have recognized the legislature's broad powers in the area of gambling regulation. See, e.g., Polk v. Edwards, 626 So.2d 1128 (La.1993); Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515 (La.1983); State v. Mustachia, 152 La. 821, 94 So. 408 (1922); Ruston v. Perkins, 114 La. 851, 38 So. 583 (1905).
Of course, the State Constitution, as did the jurisprudence under the 1921 State Constitution, gives the legislature the responsibility to suppress gambling. La. Const. art. 12, § 6(B). The Polk case followed Gandolfo v. Louisiana State Racing Commission, 227 La. 45, 78 So.2d 504 (1954), and the constitutional effort in 1974, to leave unchanged this Court's jurisprudence in that area. In fact, the 1974 Constitution made it even more clear that the legislature had the power to define, and as so defined, to suppress gambling. However, even if we assume that the legislature has chosen these Louisiana statutes as a means of suppressing gambling, it does not necessarily follow that the statutes under attack in this litigation are valid. The legislature, having chosen to ban political contributions by some members of the gaming industry, cannot run afoul of the United States Constitution. That is, no provision of our State Constitution can authorize the legislature to violate the First Amendment, which as part of the United States Constitution, is the supreme law of the land. U.S. Const. art. VI, § 2. Thus, the fact that our State Constitution directs the legislature to suppress gambling means nothing to the validity of the Louisiana statutes if the means chosen by the legislature violate the First Amendment. *838 See Citizens Against Rent Control, 454 U.S. at 295, 102 S.Ct. at 437 ("It is irrelevant that the voters rather than a legislative body enacted [the statute], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation.").
Furthermore, because the Louisiana statutes apply only to a targeted group of individuals, the State's argument that Buckley dictates that the Louisiana statutes should be subject to a more deferential standard of review than strict scrutiny is unpersuasive. As the State pointed out in its brief to this Court, the Buckley Court stated that the government could justify "even a significant interference" with protected First Amendment rights, by demonstrating a "sufficiently important interest," and by employing means "closely drawn" to avoid unnecessary infringement on protected rights. Buckley, 424 U.S. at 25, 96 S.Ct. at 638. Nevertheless, the Court also stated that the provisions at issue in that case were subject to "the closest scrutiny." Id., 96 S.Ct. at 637, 96 S.Ct. 612. Assuming arguendo that the Buckley Court did not apply strict scrutiny,[12] it does not follow that every type of contribution regulation is entitled to something less than strict scrutiny. See 44 Liquormart, 517 U.S. at 501, 116 S.Ct. at 1507 (recognizing that restrictions of similar categories of expression are not necessarily subject to a similar form of review). As discussed above, the Louisiana prohibitions differ significantly from the Buckley limits in ways which make them more burdensome on protected First Amendment rights. Given, however, that video draw poker is a legal business activity in our state, and that much of the gaming industry, and some facets of the video draw poker industry, are exempted from the prohibitions at issue, it is unlikely that the State could carry its burden even under a standard of review less rigorous than strict scrutiny. See Greater New Orleans Broadcasting Ass'n, Inc. v. United States, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999).[13] Thus, it is unnecessary to grapple with the matter of the level of scrutiny appropriate to this case.
In sum, the State may set reasonable limits, applicable to all persons, on campaign *839 contributions, for the sole purpose of reducing the corruption that results when contributors give large financial contributions in exchange for political favors, i.e., political quid pro quo. Otherwise, according to Buckley, campaign contributions are a type of political expression protected by the First Amendment. Because the Louisiana statutes at issue in this case impose a complete prohibition, against targeted individuals, for a purpose other than alleviating corruption from large contributions, they go beyond what Buckley upheld. Therefore, I conclude that the Louisiana statutes impermissibly burden the First Amendment rights of those affected by the statutes, and are therefore unconstitutional.
LEMMON, J., concurring.
The State of Louisiana, in completely denying the rights of some members of the gambling industry to contribute to political candidates and committees, claims a compelling interest in preventing actual corruption or the appearance of corruption caused by the influence of large contributions by individuals with gambling interests to a candidate's election. This argument fails for a number of reasons.
First, the State cannot legalize several forms of gambling in one fell swoop[1] and then shortly thereafter limit the First Amendment rights of some persons in the gambling industry by claiming that the now legal, licensed and highly regulated industry is corrupt. More significantly, because the persons in the gambling industry who are now totally banned from making campaign contributions were already limited by a valid statute (under Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)) from contributing more than $1000, $2500 or $5000 to candidates, there was no true danger that individual contributions of large sums of money to a candidate, for the quid pro quo arrangements feared in Buckley v. Valeo, will result in corruption of the electoral process. Finally, and perhaps most importantly, Buckley v. Valeo established only a "single narrow exception" to keeping debate on public issues "uninhibited, robust, and wide-open." The statutes and rules at issue do not come close to fitting within that narrow exception.
KIMBALL, Justice, concurring.
I concur in the judgment that the challenged provisions are unconstitutional. The laws[1] at issue, which prohibit certain persons from contributing to any political candidate, any political committee of any such candidate, or to any other political committee which supports or opposes any candidate, function in an area of the most fundamental First Amendment activities. Buckley v. Valeo, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam). "The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Id. (quoting Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). A primary purpose of this Amendment is to protect unfettered discussions of government affairs, including those relating to candidates for political office. Id. This purpose reflects "our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." Id. (quoting New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)). The "fullest *840 and most urgent" application of the constitutional guarantee embodied in the First Amendment is to political campaigns. Id. at 15, 96 S.Ct. at 632 (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971)).
In additional to this protection of political expression, the First Amendment also protects political association. Id. Protection of the right of association is afforded by the Constitution because effective advocacy, particularly of controversial points of view, is enhanced by group association. Id. at 15, 96 S.Ct. at 633. Thus, the right to associate with others for the common advancement of political beliefs and ideas is protected by the First Amendment. Id.
In light of the broad protection afforded political expression and association by the First Amendment, which the Buckley Court recognized was offended by the even-handed imposition of mere limitations on campaign contributions, I cannot conclude that the absolute prohibitions on the exercise of protected rights by a targeted number of persons pass constitutional muster. I reach this conclusion for a number of reasons.
First, in upholding federal legislation that imposed a ceiling on the amount any one person or group could contribute to a candidate or political committee, the Buckley Court identified a "single narrow exception" to the rule that limits on political activity are contrary to the freedoms guaranteed by the First Amendment. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 296-297, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981). There, the Court reasoned that although contribution limitations impinge upon First Amendment freedoms, such limitations only marginally restrict the contributor's ability to engage in protected communication. Buckley, 424 U.S. at 20, 96 S.Ct. at 635. The Court's characterization of the contribution as a "marginal restriction" stemmed from its recognition that a limitation on the amount of money a person may give to a candidate or campaign organization involves "little direct restraint" on his political communication because it permits the "symbolic expression of support evidenced by a contribution" and still allows the contributor to discuss candidates and issues. Id. at 21, 96 S.Ct. at 636. Additionally, the Court found that "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate." Id. at 22, 96 S.Ct. at 636. Furthermore, contributions enable "like-minded persons to pool their resources in furtherance of common political goals." Id. For these reasons, the Court recognized that the Act's contribution ceilings limit one "important" means of associating with a candidate or committee, although they do allow contributors to become a member of any political association and to personally assist in the association's efforts on behalf of candidates. Id. The Court concluded that the "limited effect[s]" the contribution ceilings had upon First Amendment freedoms were justified by the government's interest in preventing actual corruption or the appearance of corruption that large individual contributions can have on a candidate who is elected to office. Id. at 29, 96 S.Ct. at 640.[2]
*841 The instant case, however, does not fall into the single narrow exception identified in Buckley. There, the Court recognized that marginal restrictions involving little direct restraint on protected First Amendment freedoms were imposed by the contribution limits at issue in that case because the limitations nevertheless allowed the symbolic expression of support a contribution evidences. In contrast, the laws at issue absolutely prohibit certain persons from contributing to any candidate, any political committee or any such candidate, or any other political committee which supports or opposes any candidate. This prohibition forbids certain specified persons from engaging in the symbolic expression of support the Buckley Court relied on in concluding that contribution limitations are not repugnant to our Constitution. The fact that the laws do not purport to restrict the freedom of the specified persons from engaging in other types of political expression or from associating in other ways does not serve to lessen the impingement the absolute prohibition produces on First Amendment freedoms. See Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (holding that an Illinois law prohibiting a person from voting in the primary election of a political party if he had voted in the primary of any other party within the preceding twenty-three months unconstitutionally infringed upon the right of free political association even though it did not deprive persons of all opportunities to associate with the political party of their choice because it "absolutely preclude[d]" them from voting in a chosen party's primary election).
The complete ban on campaign contributions imposed by the laws at issue amounts to a "difference in kind" rather than a "distinction in degree" when compared to the contribution limitations upheld in Buckley. This is significant because Buckley instructs that courts should not invalidate such limitations on the basis that a $2,000 limit on contributions, for example, will not serve as well as a $1,000 limitation since these "distinctions in degree" are more properly drawn by the legislature than by the judiciary. Buckley, 424 U.S. at 30, 96 S.Ct. at 640 ("While the contribution limitation provisions might well have been structured to take account of the graduated expenditure limitations for congressional and Presidential campaigns, Congress' failure to engage in such fine tuning does not invalidate the legislation.... [I]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000. Such distinctions in degree become significant only when they can be said to amount to differences in kind.") (footnote omitted) (internal quotations omitted); FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (Rehnquist, C.J., concurring in part and dissenting in part). Such deference, however, is not accorded legislative determinations when they can be said to "differ in kind" from those approved in Buckley. As noted above, the laws challenged in this case absolutely prohibit certain persons from contributing to political campaigns while the law upheld in Buckley allowed those wishing to express their political views by contributing to a political candidate to do so, at least symbolically. It was the federal law's allowance of this symbolic expression that permitted the Court in Buckley to conclude that the challenged law imposed only a marginal restriction on protected First Amendment rights. Unlike the limitations considered in Buckley, the prohibitions at issue completely silence political expression in the form of contributions by a small segment of our society who are licensed by the State to conduct gaming-related business. The fact that the laws at issue totally silence such expression cause it to be "different in kind" *842 from the contribution ceilings approved in Buckley.[3] Thus, the deference given to Congress' determination of the suitability of the particular limitations upheld in Buckley is not mandated in the instant case.
An additional reason the challenged laws are, in my view, unconstitutional deals with the fact that the State's ban against certain persons involved in the gaming industry from voicing their political ideas by way of campaign contributions, while allowing anti-gambling forces to fully voice their ideas, in part through campaign contributions, is contrary to the design of the First Amendment. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment...." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 790-791, 98 S.Ct. 1407, 1423, 55 L.Ed.2d 707 (1978); Buckley, 424 U.S. at 48-49, 96 S.Ct. at 649. In supporting its prohibition, the State points out that, for the fiscal year ending June 30, 1998, truck stops with video poker devices received over $205,000,000 in net device revenues. It then argues that revenues of this magnitude would, in the absence of the challenged prohibitions, allow the gaming industry to disproportionately affect the political process if they are allowed to contribute to candidates and committees supporting or opposing candidates. Buckley makes it clear, however, that "contributors cannot be protected from the possibility that others will make larger contributions." Citizens Against Rent Control, 454 U.S. at 295, 102 S.Ct. at 437. Therefore, that certain persons with substantial ties to the gaming industry may, in fact, personally possess greater wealth or control a larger bank account than the average citizen cannot justify the instant infringement on *843 protected First Amendment rights. This is especially true in light of the fact that persons with substantial ties to the gaming industry, as well as all other persons, are subject to Louisiana's general contribution limits similar to the ones upheld in Buckley. See La. R.S. 18:1505.2(H).
In a related vein, the fact that gambling may be characterized as a "vice" does not serve to lessen the First Amendment rights of those involved in its operation. As the Court stated in 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996):
Moreover, the scope of any "vice" exception to the protection afforded by the First Amendment would be difficult, if not impossible, to define. Almost any product that poses some threat to public health or public morals might reasonably be characterized by a state legislature as relating to "vice activity." Such characterization, however, is anomalous when applied to products such as alcoholic beverages, lottery tickets, or playing cards, that may be lawfully purchased on the open market. The recognition of such an exception would also have the unfortunate consequence of either allowing state legislatures to justify censorship by the simple expedient of placing the "vice" label on selected lawful activities, or requiring the federal courts to establish a federal common law of vice. For these reasons, a "vice" label that is unaccompanied by a corresponding prohibition against the commercial behavior at issue fails to provide a principled justification for the regulation of commercial speech about that activity.
Id. at 514, 116 S.Ct. at 1513-14 (internal quotations omitted).[4] In other words, the State cannot justify an infringement on protected First Amendment rights by alleging that the protected rights relate to a "vice" activity when the State itself allows the so-called "vice" to legally exist. Such a result would be contradictory to the decision of this State, and, indeed, that of almost every state in the nation, to confer legal status upon certain gaming activities. See Greater New Orleans Broadcasting Ass'n., Inc. v. United States, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (noting that some form of gambling is legal in nearly every State and that "in the judgment of both the Congress and many state legislatures, the social costs that support the suppression of gambling are offset, and sometimes outweighed, by countervailing policy considerations, primarily in the form of economic benefits"). Once a state confers the benefit of legalization upon the gaming industry, it cannot require that industry to surrender its First Amendment rights. 44 Liquormart, 517 U.S. at 513, 116 S.Ct. at 1513 ("Even though government is under no obligation to provide a person, or the public, a particular benefit, it does not follow that conferral of the benefit may be conditioned on the surrender of a constitutional right.").
Finally, even if I were to accept the correctness of the State's argument that the laws at issue are necessary to combat *844 the perception of corruption associated with gambling interests and to foster confidence in the electoral process, a point I do not necessarily concede, I would be constrained to conclude the laws at issue are overbroad in their scope. The challenged provisions absolutely prohibit specified persons connected with the gaming industry from contributing to any candidate, any political committee of any candidate, or any other political committee which supports or opposes any candidate. Thus, for example, the owner of a truck stop is prohibited from contributing any amount of money to his local school board candidate or to a candidate seeking to become coroner. I fail to see how such offices could favorably affect gaming interests such that there exists the possibility for a political quid pro quo. Consequently, the laws, as presently written, seem overbroad.[5]
For all the above reasons, I conclude the challenged laws are unconstitutional. To uphold these laws, which single out a group of persons who operate legal businesses in our State because their political expressions are assumed by some to be harmful, is to begin a descent down a slippery slope. We know not where that slope ends. At any time, our own protected views may be deemed harmful or may become unpopular and we may find ourselves wishing we never started down that path.
VICTORY, Justice, dissenting.
I would declare our Louisiana statute constitutional, thus providing the citizens of Louisiana the same measure of protection from corruption and the appearance of corruption involving gambling interests and our public officials that has existed for the citizens of New Jersey, one of our nation's largest gambling states, for almost a quarter of a century. Therefore, I respectfully dissent.
For over one hundred years, the Louisiana Constitution has mandated that the Louisiana Legislature suppress gambling. Although I sometimes wonder what form of gambling the Legislature now suppresses, the statute at issue in this case is a serious first attempt by the Legislature to separate elected public officials from an industry that has been and is fraught with corruption. The history of corruption and the appearance of corruption in the gambling industry itself and with respect to public officials has been well documented for over a century and continues to this day.
Today, a narrow majority of this Court declares the Legislature's attempt unconstitutional, citing primarily the United States Supreme Court case of Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), decided in 1976. This is certainly a startling result since the Buckley case, which struck down expenditure limits for candidates, specifically approved limits on campaign contributions enacted by Congress. Further, the Buckley case did not even involve the gambling industry, nor did it discuss or invalidate complete prohibitions on campaign contributions, as does the majority today.
Since the Buckley case was decided in 1976, only two cases in the United States have reached the appellate level that speak directly to the issues presented in this case. Both cases upheld the constitutionality of the state statutes at issue. Yet, these cases are either completely ignored or hardly mentioned in the opinions of the Justices declaring our statute unconstitutional. Within a few months after Buckley was released, the Illinois Supreme Court decided Schiller Park Colonial Inn, Inc. v. *845 Berz, 63 Ill.2d 499, 349 N.E.2d 61 (1976). The issues in Schiller are very similar to the issues in the case sub judice. Liquor licensees challenged the constitutionality of an Illinois statute prohibiting a liquor licensee or any associate of such licensee from making any contribution to any political candidate. Relying on Buckley, the Illinois Supreme Court held the statute constitutional, stating that its purpose was to avoid corruption or the appearance of corruption in the political process.
In 1977, the New Jersey Legislature passed a law substantially similar to the Louisiana statute at issue here today, i.e. completely prohibiting key gambling officials from making campaign contributions. Significantly, this statute was enacted in the wake of Buckley. When the law was challenged, the trial court upheld the statute and the New Jersey appellate court affirmed in a lengthy opinion relying on Buckley. Petition of Soto, 236 N.J.Super. 303, 565 A.2d 1088 (1989). After the New Jersey Supreme Court denied writs, opponents of the law filed writs with the United States Supreme Court. But the United States Supreme Court denied writs, leaving in place a constitutional statute enacted in 1977, much like the statute at issue here, that completely prohibits certain gambling officials from making any campaign contributions to public officials in New Jersey, one of the biggest gambling states in the country.
The concurring opinions misinterpret Buckley and its progeny. I agree that Buckley states the provisions at issue in this case operate in an area of the most fundamental First Amendment activities. Buckley, 424 U.S. at 14, 96 S.Ct. at 632. However, Buckley stated that "even a `significant interference' with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." Id. at 25, 96 S.Ct. at 637 (citations omitted). Although the Supreme Court recognized Buckley identified a "single narrow exception" to the rule that limits on political activity were contrary to the freedoms guaranteed by the First Amendment, that is, to limit actual corruption and the appearance of corruption that results from large individual financial contributions, this does not mean that no other "exceptions," or sufficiently important interests, exist to justify limits on political contributions to candidates. Since this sufficiently important interest was found in the federal act's primary purpose, the Buckley Court stated that it was unnecessary to look beyond the act's primary purpose in order to find additional constitutionally sufficient justifications and therefore, did not look to see if any other sufficiently important interests existed. Clearly, corruption and the appearance of corruption resulting from other areas, such as gambling, would qualify as an "exception," as it did in Soto.
Further, the Court found that the limitation of political contributions entails only a "marginal" restriction due to the fact that a contribution is only "symbolic expression." As one commentator stated,
This is so because people who would otherwise give amounts greater than the statutory limits are hardly bottled up once they reach the ceiling. Many avenues of communication remain open to them, the Court states, they can "expend such funds on direct political expression." [Buckley] at 21-22[, 96 S.Ct. 612] (emphasis added). In other words, the speaker could buy the newspaper ad or TV commercial or handbills directly, instead of giving the money to the candidate for the candidate to choose how to spend it. If he avoided collaboration with the candidate, his spending in this fashion would not count as a contribution. Id. at 46-47 & n. 53[, 96 S.Ct. 612].
J. Skelly Wright, Politics and Communication: Is Money Speech?, 85 Yale L.J. 1001, 1010 n. 40 (1976). The Court stated that there is no communication of the underlying basis for the support since the *846 contributor does not say why he is supporting a certain candidate or even that he agrees with everything that the candidate proposes. Furthermore, the limitation does not infringe on the freedom to discuss candidates and issues. Buckley, 424 U.S. at 20-21, 96 S.Ct. at 635-636. The contribution limits only restrict one means of associating with a candidate and still allows a contributor to become a member of a political association and to personally assist in the association's efforts on behalf of candidates. Id. at 22, 96 S.Ct. at 636. The Court stated that "the transformation of contributions into political debate involves speech by someone other than the contributor." Id. at 20, 96 S.Ct. 612. In a later case, the Supreme Court acknowledged that this type of "`speech by proxy'... is not the sort of political advocacy that [the] Court in Buckley found entitled to full First Amendment protection." California Medical Association v. Federal Election Commission, 453 U.S. 182, 196, 101 S.Ct. 2712, 2722, 69 L.Ed.2d 567 (1981).
The prohibition of political contributions is of the marginal type referred to by the Supreme Court in Buckley because the prohibition only eliminates "symbolic expression." There is no limitation to speak out on public issues, to support a particular candidate through expression of views, or to join and participate in a political party. Basically, the persons prohibited from making contributions can support candidates of their choice in virtually every other way. This prohibition is the more limited type of limitation on First Amendment freedoms, as recognized in Buckley .
The question then becomes whether the State has asserted a sufficiently important interest in prohibiting contributions from certain persons in the gambling industry. The "exception" in Buckley related to the perception of undue influence of large contributors to a candidate. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 297, 102 S.Ct. 434, 437-438, 70 L.Ed.2d 492. The Court stated,
Congress could legitimately conclude that the avoidance of the appearance of improper influence "is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent." [citations omitted].
Buckley, 424 U.S. at 26-27, 96 S.Ct. at 638. Here, given the history of corruption in gambling and the political process in this State, the perception of undue influence by would-be contributors in the gambling industry to candidates is a far more important State interest than the possible undue influence by large contributors.
The two cases previously discussed, dealing directly with the issues in this case, are particularly persuasive as to the issue of prohibiting certain persons from contributing to political candidates. In Petition of Soto, a casino employee challenged the constitutionality of a New Jersey statute that prohibited any casino key employee from contributing any money or thing of value to any political candidate or committee of any political party. In holding the statute constitutional, the court found a compelling state interest in preventing the appearance of impropriety given the "acknowledged vulnerability of the casino industry to organized crime and the compelling interest in maintaining the public trust, not only in the casino industry but also the governmental process which so closely regulates it." Petition of Soto, 565 A.2d at 1098. In addition, the court found that the statute had been narrowly drawn and precisely tailored. The court commented that gambling "is an activity rife with evil" and that it was the pronounced policy of the State "to regulate and control the casino industry with the utmost strictness." The New Jersey Supreme Court and the United States Supreme Court refused to review the Soto case.
Schiller Park Colonial Inn, Inc. v. Berz was decided two months after the decision by the Supreme Court in Buckley. In *847 Schiller, liquor licensees challenged the constitutionality of an Illinois statute prohibiting a liquor licensee or any associate of such licensee from making any contribution to any political candidate. In holding the statute constitutional, the Illinois Supreme Court stated that in view of the substantial state interest involved and the fact that the statute imposed relatively minor limitations upon the licensees' rights, the statute did not violate rights of free speech or association. The court noted that the statute did not prohibit them from engaging in pure speech and the licensees remained free to express their opinions to anyone who would listen, announce their support for candidates, express their political opinions by exercising their voting rights, join political parties, and volunteer services to those parties or groups. The same is true under our statute at issue today.
Here, the State's interest in preventing corruption or the appearance of corruption by people in the gambling industry with regard to public officials is even more important than the prevention of corruption or the appearance of corruption by large contributors at issue in Buckley. As previously noted, the Louisiana Constitution specifically provides that the legislature shall suppress gambling. La. Const. of 1974 art. XII, Sec. 6. During the debate on the legalization of gambling in this State, citizens voiced apprehensions of government corruption. Gambling was only approved after assurances of stringent regulation by the government. La. Rev.Stat. 27:2(A). Clearly, the State has asserted a sufficiently important interest in preventing corruption and the perception of undue influence by people in the gambling industry on candidates for public office given the long history of gambling and corruption of public officials in this State, as shown in Justice Knoll's dissent.
Therefore, the analysis of our statute must focus on whether the ban on political contributions is closely drawn to prevent corruption and the appearance of corruption in the political process. Our statute targets individuals who play a pivotal role in the gambling industry and exercise substantial power in the gambling industry in this State. Merely because some others involved in gambling are not covered by the statute does not defeat the requirement that the statute be "narrowly drawn." As the New Jersey court stated, "[a] public perception that any improper influence has infiltrated the [regulatory] processes, however slightly, would undermine the trust that is essential to continued confidence in the industry and, what is more important, in state government." Petition of Soto, 565 A.2d at 1098.
In addition, our statute is not overbroad in scope. As a practical matter, the legislature would have a difficult and probably impossible task of determining exactly which elected officials "will be in a position to exercise influence in the area of [gambling] regulation." Schiller Park Colonial Inn, Inc., 349 N.E.2d at 67. As the Illinois Supreme Court stated,
The nature of our political system and past history suggests that political officials or public officers may wield powers or possess influence beyond the powers and influence inherent in their official duties. In attempting to prevent [persons interested in gambling] from obtaining influence in the area of [gambling] regulation, therefore, the legislature acted reasonably in proscribing the giving of campaign contributions by [persons interested in gambling] to any candidate. (emphasis added).
Id.
Lastly, it is argued that the prohibition does not further the State's interest in preventing corruption or the appearance of corruption since Louisiana law already provides disclosure requirements for candidates and limitations on contributions that an individual can give a candidate. Yet, the United States Supreme Court has stated that the courts shall not "second-guess a legislative determination as to the need for prophylatic measures where corruption *848 is the evil feared." FEC v. National Right to Work Committee, 459 U.S. 197, 210, 103 S.Ct. 552, 561, 74 L.Ed.2d 364 (1982). The Legislature obviously believed that a complete ban on contributions, along with a requirement of complete disclosure, was needed to further the State's interest of preventing corruption or the appearance of corruption in the gambling industry.
For the reasons stated and also for the excellent reasons stated in the opinion of Justice Knoll, I respectfully dissent.
KNOLL, Justice, dissenting.
I respectfully dissent. By this per curiam, the Court[1] ignores a body of federal and state jurisprudence that finds a restriction of a First Amendment right constitutionally permissive when the restriction is narrowly drawn and directly advances an asserted governmental interest, such as in this case: that the election process be not only free from corruption, but also free from the appearance of corruption. The inherent weakness in the Court's position is its total disregard of this State's history, steeped in gambling corruption, and application of the restriction as though it were applicable to the private sector. This omission strikes at the heart of the Legislature's narrowly drawn restrictions and the asserted governmental interest therein.
"[T]he ultimate good desired is better reached by free trade in ideasthat the best test of truth is the power of the thought to get itself accepted in the competition of the market...." Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., joined by Brandeis, J., dissenting) (emphasis added). At the heart of "free trade" in the political marketplace is the necessity that the election process be not only free from corruption, but also free from the appearance of corruption. I find that La. R.S. 18:1505.2(L)(3)(a)(i), La.R.S. 18:1505.2(L)(3)(b)(i) as applied to La.R.S. 18:1505.2(L)(3)(a)(i) and Rule 107 of Title 42 of the Louisiana Administrative Code permissibly curb the unhealthy political influence or the appearance of unhealthy political influence which persons substantially interested in this State's gaming industry could bring to bear on an election.[2]
The Louisiana Constitution of 1879 declared gambling a "vice" and the Legislature was directed to enact laws for its suppression. LA. CONST. art. 172 (1879). Louisiana's Constitutions of 1898, 1913, and 1921 all contained similar provisions regarding gambling. See LA. CONST. art. 19, § 8 (1921); LA. CONST. arts. 178, 188, 189 (1913); LA. CONST. arts. 178, 188, 189 (1898). Although the delegates to the Constitutional Convention which convened on January 5, 1973, eliminated the moral condemnation of gambling and chose to suppress gambling rather than prohibit it, it is clear that the Legislature continued its role of defining gambling. Polk v. Edwards, 626 So.2d 1128, 1141 (La.1993). Thus, the Louisiana electorate ratified the Constitution of 1974 which followed its predecessor documents with the inclusion of article XII, § 6(B) that "[g]ambling shall be defined by and suppressed by the legislature." In order to understand the reasons for these constitutional declarations throughout the period of Louisiana's statehood, reference to the history of gambling in this State is essential.
Historically, gambling has been recognized as a vice activity which poses a threat to public health and public morals. Although the vice of gambling existed throughout the State during the eighteenth and nineteenth centuries, New Orleans *849 was recognized as the gambling capital. See TIMOTHY L. O'BRIEN, BAD BET: THE INSIDE STORY OF THE GLAMOUR, GLITZ, AND DANGER OF AMERICA'S GAMBLING INDUSTRY 99 (1998). The State outlawed gambling in 1812, but New Orleans received a special exemption that allowed gambling to continue.
When federal troops occupied New Orleans from 1862 to 1877, the Louisiana Lottery Company, a private corporation, went into business. O'BRIEN, supra, at 105-06. Even though the Constitution had previously declared lotteries illegal, a constitutional amendment was passed in 1866 and the Louisiana Lottery Corporation was given a 25-year charter to operate. Id. The Lottery was marketed nationwide via the mail and branch offices and by 1890 was taking in $28 million yearly. Id. at 106-07. Lottery proceeds not only paid for the first waterworks in New Orleans, but this lucre supported the New Orleans charity hospital and upgraded the public schools. Id. at 107; Stephanie A. Martz, Note, Legalized Gambling and Public Corruption: Removing the Incentive to Act Corruptly, or, Teaching an Old Dog New Tricks, 13 J.L. & Pol. 453, 458-59 (1997). In 1893, the federal government intervened in the Louisiana Lottery and passed a law prohibiting any form of lottery sales and promotion. Martz, supra, at 459.
Gambling remained available in New Orleans during the first decades of the twentieth century in small establishments around the city, even though the Constitution had outlawed all gambling. O'BRIEN, supra, at 108. In 1934, Huey P. Long allowed slot machines in New Orleans and several casinos outside the city. Id. In the 1950s a reform movement ran the larger casinos away, but the slot machines and back-alley casinos stayed in business until the 1970s. Id. at 109.
With the boom of the petrochemical industry during the 1970s and 1980s, the State's economy was revitalized. Id. There was no longer a need for gambling proceeds to fund government projects, that is until the bottom fell out of the oil industry. See id. However, when the State's economy went into a tailspin with the decline in the oil industry, the State Legislature, armed with its constitutional authority to "define gambling," turned to legalized gambling as a means out of the fiscal doldrums. See id. In a series of enactments in 1991 and 1992, the Legislature passed four acts providing for the licensing of gaming, to-wit: at a land-based casino in New Orleans, La.R.S. 4:601-686; on cruise ships operating out of New Orleans, La.R.S. 14:90(B); on river boats operating on designated rivers in the state, La.R.S. 4:501-562; and by means of video poker machines located throughout the State, La. R.S. 33:4862.1-19.
In Polk, although this Court upheld the power of the Legislature to provide for the licensing of gaming, it further recognized that the Legislature's authority to regulate gambling constitutes a legitimate exercise of police power.[3]Id. at 1137; see also Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515, 516 (La.1983); State v. Mustachia, 152 La. 821, 94 So. 408 (1922); Ruston v. Perkins, 114 La. 851, 38 So. 583 (1905). "Defining and prescribing means of suppression are left to the state Legislature and the legislative determination in this regard constitutes an appropriate exercise of police power for the protection of the public." Theriot, 436 So.2d at 521. Moreover, in Polk this Court further held that the power to suppress gambling and "to determine how, when, where, and in what respects gambling shall be prohibited or permitted" has been constitutionally delegated to the Legislature. Polk, 626 So.2d at 1128.
In 1996, the Legislature, pursuant to its constitutional mandate to define and suppress *850 gambling, enacted the Louisiana Gaming Control Law, La.R.S. 27:1:392. From the outset, the legislation announced the public policy of this State concerning gaming. In La.R.S. 27:2(A), the Legislature stated:
The legislature hereby finds and declares it to be the public policy of the state that the development of a controlled gaming industry to promote economic development of the state requires thorough and careful exercise of legislative power to protect the general welfare of the state's people by keeping the state free from criminal and corrupt elements. The legislature further finds and declares it to be the public policy of the state that to this all persons, locations, practices, associations, and activities related to the operation of licensed and qualified gaming establishments and the manufacture, supply, or distribution of gaming devices and equipment shall be strictly regulated.
This legislation further declared that
[a]ny license, casino operating contract, permit, approval, or thing obtained or issued pursuant to the provisions of this Title or any other law relative to the jurisdiction of the board is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise, under the constitution of the United States or of the state of Louisiana.
La.R.S. 27:2(B) (emphasis added); see also Catanese v. Louisiana Gaming Control Bd., 97-1426 (La.App. 1 Cir. 5/15/98), 712 So.2d 666, 670, writ denied, 98-1678 (La.10/9/98), 726 So.2d 30; Eicher v. Louisiana State Police, Riverboat Gaming Enforcement Div., 97-0121 (La.App. 1 Cir. 2/20/98), 710 So.2d 799, 807, writ denied, 98-0780 (La.5/8/98), 719 So.2d 51.
In the same legislative session, the Legislature enacted La.R.S. 18:1505.2(L) relative to campaign finance. As the Court herein recognized, the provisions of La. R.S. 18:1505.2(L) prohibit persons substantially interested in the gaming industry of this State, as more particularly defined in the statute, from making campaign contributions, loans, or transfers of funds to any candidate, any political committee of any such candidate, or any other political committee which supports or opposes any candidate. The purpose of this prohibition against campaign contributions from this segment of society is set out in La.R.S. 18:1505.2(L)(1):
[I]t is essential to the operation of effective democratic government in this state that citizens have confidence in the electoral process and that elections be conducted so as to prevent influence and the appearance of influence of candidates for public office and of the election process by special interests, particularly by persons substantially interested in the gaming industry of this state. (emphasis added).
It is against this well-defined backdrop that I view the provisions now before us, and it is this setting that I find the Court fails to reference in its assessment of the narrow restriction on relators' First Amendment rights which directly advances an asserted governmental interest. Partly because of this State's history and in part because of the constitutional mandate that the Legislature suppress gambling, I find that the Court today impermissibly interferes with the legislative determination as to the need for prophylactic measures where corruption or the appearance of corruption is the evil feared. See Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982). "These interests directly implicate `the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process.'" Id. at 208 (quoting United States v. Automobile Workers, 352 U.S. 567, 570, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957)).
*851 Although the Court references Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), as the seminal case on campaign contributions and expenditures, I find that it only pays lip service to the opinion as a whole and misconstrues its holding as applicable herein. Without even entering the foray of whether Buckley requires strict scrutiny of the legislative enactments now implicated,[4] I find that the State has well demonstrated an important governmental interest in the enactment of legislation to insure an effective democratic government and has closely drawn the means to avoid the unnecessary abridgement of any associational freedom implicated. Thus, even if the legislation significantly interferes with these video draw poker licensees' protected rights of political association, I find no constitutional impingement which would interdict this legislation, because the restriction is narrowly drawn and directly advances an asserted governmental interest.
Buckley recognized the legislative proponents' assertion that the "primary interest served by the limitations [on campaign spending] is the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." Id. at 25, 96 S.Ct. 612. The Buckley opinion further embodies the principle that our system of democracy is undermined to the extent that large political contributions are given or appear to be given to secure a political quid pro quo from potential and current office holders. Id. at 26-27, 96 S.Ct. 612.
Even if Buckley protects both political expression and political association, it nonetheless stands for the proposition that these constitutional interests may be impeded if the state has a sufficiently compelling countervailing interest, and the stricture is narrowly tailored to meet the state's concern. Id. at 28, 96 S.Ct. 612; see also 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 528-29, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (O'Connor, J., joined by Rehnquist, C.J., and Souter and Breyer, JJ., concurring in part and concurring in the judgment) (noting that for a commercial free speech restriction to pass constitutional muster, it must be decided whether the regulation "directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)).
In the present case, the Legislature, pursuant to its constitutional mandate to define and suppress gambling and with full knowledge of this State's corrupt gambling history, has narrowly excluded persons substantially interested in this State's gaming industry, to include video draw poker licensees, from making campaign contributions. Instead of a blanket regulation covering every individual as in Buckley, the Louisiana Legislature defined well-delineated restrictions on a strictly regulated industry in imposing this ban on campaign contributions. I would find that the Louisiana Legislature has enacted narrowly tailored statutes to achieve the expressed, compelling state interest.[5]
*852 It is also significant to me that these legislative provisions only affect one aspect of political expression, i.e., the making of campaign contributions. Notwithstanding this ban, these licensees can nonetheless participate in the direct exercise of their First Amendment speech rights, e.g., they may make independent expenditures supporting or opposing particular candidates; they may urge their employees to support or oppose particular candidates; corporate officers and employees may openly support individual candidates by displaying yard signs and voluntarily working in political campaigns; they may even sponsor phone banks to encourage persons to vote.
It has long been held that neither the right to associate nor the right to participate in political activities is absolute. United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 567, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). In stark contrast to the direct speech rights that these licensed gaming entities and individuals can utilize, there are numerous instances where individuals are absolutely barred from the exercise of their First Amendment rights in the political process: classified civil servants and members of the Civil Service Commission, LA. CONST. art. X, § 9; judges, LA. CODE OF JUDICIAL CONDUCT, Canon 7; members of the Louisiana Board of Ethics, La.R.S. 42:1132(B)(3)(e). In the present case, I simply view the limitations of La.R.S. 18:1505.2(L) as restrictions that these licensees must abide by in order to engage in the privilege of licensed gaming activities.
Even though the present legislation goes beyond Buckley's sanctioned limitation on political contributions, I do not find that the ban of such political contributions impermissibly offends the relators' First Amendment rights because of the well demonstrated State interest in the regulation of this industry and the narrowness of the restriction drawn. In this regard, I wholeheartedly subscribe to the dissent of Justice Victory in the case sub judice and his reliance on Petition of Soto, 236 N.J.Super. 303, 565 A.2d 1088 (1988), certif. denied, 121 N.J. 608, 583 A.2d 310 (1990), cert. denied, 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 664 (1990) and Schiller Park Colonial Inn, Inc. v. Berz, 63 Ill.2d 499, 349 N.E.2d 61 (1976). As the New Jersey court observed in Soto, the state has a compelling state interest in upholding the integrity of the political process from corruption. Considering the Legislature's definition of gambling in this State and its mandate to suppress gambling, I find that a total prohibition on campaign contributions from this industry's substantial members directly advances an asserted governmental interest by the Legislature.
I likewise find the argument unpersuasive that this State's enactment of disclosure requirements for political contributions obviated the necessity for the more stringent ban adopted by the Legislature. As noted in Buckley where a similar argument was made, the Legislature was entitled to conclude that disclosure was only a partial answer to the problem. Buckley, 424 U.S. at 28, 96 S.Ct. 612. Thus, I find that the disclosure requirements did not supplant the Legislature's decision to require more.
The courts have repeatedly recognized that the legislative branch of government maintains a strong, vital interest in protecting the political process from distortion and corruption. United States v. Classic, 313 U.S. 299, 317-320, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); Burroughs v. United States, 290 U.S. 534, 545, 54 S.Ct. 287, 78 L.Ed. 484 (1934); Ex Parte Yarbrough, 110 U.S. 651, 657, 4 S.Ct. 152, 28 L.Ed. 274 (1884). "Nothing bars us from choosing... a process wherein ideas and candidates prevail because of their inherent worth, not because ... one side puts on the more elaborate show of support. Nothing in the First Amendment bars us from those steps." J. Skelly Wright, Politics and the Constitution: Is Money *853 Speech?, 85 Yale L.J. 1001, 1005 (1976). Albeit that there are industries that participate in the election process that are as well-monied as the gambling industry, that which differentiates the latter is its existence as an "absolute revocable privilege," its close governmental regulation, and its undistinguished place in this State's history.
NOTES
[*] Marcus, J., not on panel. Rule IV, Part II, § 3.
[2] We note that other sections of LSA-R.S. 18:1505.2(L) also prohibit certain persons from contributing to candidates and political committees of candidates. Those other sections are not under attack in this lawsuit. Therefore, we do not consider their validity in this opinion.
[1] La.Rev.Stat. Ann. § 18:1505.2(L)(3) also provides the following:

(a)(ii) Any person who holds a license to conduct gaming activities on a riverboat, who holds a license or permit as a distributor or supplier of gaming devices or gaming equipment including slot machines, or who holds a license or permit as a manufacturer of gaming devices or gaming equipment including slot machines issued pursuant to the Louisiana Riverboat Economic Development and Gaming Control Act, and any person who owns a riverboat upon which gaming activities are licensed to be conducted.
(a)(iii) Any person who holds a license or entered into a contract for the conduct of casino gaming operations, who holds a license or permit as a distributor of gaming devices or gaming equipment including slot machines, or who holds a license or permit as a manufacturer of gaming devices or gaming equipment including slot machines issued pursuant to the Louisiana Economic Development and Gaming Corporation Act, and any person who owns a casino where such gaming activities are licensed.
(b)(ii) Any holding, intermediary, or subsidiary company of any person included in Subparagraph (a) of this Paragraph and any officer, director, trustee, or partner thereof.
(c) Any officer, director, trustee, partner, or senior management level employee or key employee as defined in R.S. 27:205(19) of any person included in Subparagraph (a) or (b) of this Paragraph.
(d) Any person subject to the provisions of R.S. 27:63(C)(4), 226(C)(4) or 261(D).
(e) The spouse of any person to whom this Subsection is made applicable by this Paragraph.
[2] Indiana, Iowa, Kentucky, Michigan, Nebraska, New Jersey and Virginia have statutes prohibiting contributions to candidates by certain employees in the gaming industry. The New Jersey Superior Court has addressed the constitutionality of its provisions in Petition of Soto, 236 N.J.Super. 303, 565 A.2d 1088 (1989), certif. denied, 121 N.J. 608, 583 A.2d 310 (1990), and found the prohibition constitutional. The Michigan Attorney General has rendered an opinion that the Michigan statute is constitutional. See Michigan AG Opinion 7002 (Dec. 17, 1998).
[3] Lounges, restaurants, hotels and motels pay 26% of net gaming proceeds to the State in franchise fees. Racetracks (pari-mutuel facilities) and off-track wagering facilities pay 22.5% of net gaming proceeds to the State in franchise fees. Truck stops pay 32.5% of net gaming proceeds to the State in franchise fees.
[4] The 1997 net proceeds of $618,477,000 required a $173,326,000 franchise fee payment, leaving the industry with $445,151,000 in revenue.
[5] It is also apparent from the list of the top 50 companies that there are other industries generating far more revenue than the video poker industry. As the list makes clear, McDermott International Inc. and J. Ray McDermott, S.A, energy services companies, had a combined net income of $409,300,000 for 1998; CenturyTel Inc., a member of the telecommunications industry, generated $228,800,000 in 1998; while a member of the banking industry, Hibernia Corp., generated $176,900,000 in 1998.
[1] Other sections of La. R.S. 18:1505.2(L) also contain provisions which prohibit various persons associated with the gaming industry from contributing to candidates for elective office. Those other sections are not under attack in this lawsuit. Therefore, I express no opinion as to their validity.
[2] Section 1502.2(L)(3)(a)(i)'s prohibition applies to any person licensed under the Video Draw Poker Devices Control Law, La. R.S. 27:301, et seq., as a distributor, manufacturer, or service entity of gaming devices. Further, when any truck stop, pari-mutuel or off-track wagering facility is licensed for video draw poker devices, its owners are included in the prohibition. See La. R.S. 18:1502.2(L)(3)(a)(i).

However, various other persons associated with the video draw poker industry are exempted from the prohibition. For instance, those who actually own the video draw poker devices are exempted, as well as owners of bars, lounges, hotels, motels, and restaurants licensed for video draw poker.
The prohibitions established in section 1502.2(L)(3)(a)(i) are broadened by section 1502.2(L)(3)(b)(i), which makes the prohibition applicable to any person who has an "interest," directly or indirectly, in any legal entity prohibited from contributing under section 1502.2(L)(3)(a)(i). See La. R.S. 18:1502.2(L)(3)(b)(i). Persons with an "interest" in one of the affected legal entities include individuals, as well as their spouses, who have greater than a ten percent ownership interest in the entity. See id.
[3] As discussed in note 2, supra, not all members of the video draw poker industry are covered by the prohibition. Thus, in addition to their First Amendment challenge, Appellees also argue that the Louisiana statutes violate the equal protection clauses of the United States and Louisiana Constitutions. The district court, however, held the Louisiana statutes unconstitutional under the First and Fourteenth Amendments to the United States Constitution.
[4] The First Amendment to the United States Constitution states in part that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment. 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489, 116 S.Ct. 1495, 1501 n. 1, 134 L.Ed.2d 711 (1996).
[5] For example, during the 1972 presidential campaign, over $3 million dollars in presidential campaign contributions were attributable to six large contributors who were actively seeking appointments to ambassadorships. Buckley v. Valeo, 519 F.2d 821, 840 n. 38 (D.C.Cir.1975), aff'd in part and rev'd in part, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Further, campaign fund-raisers routinely advised potential contributors that "only the President could guarantee nomination" to such a position. Id.
[6] As the State points out in its brief to this Court, legislation imposing prohibitions on political activity by government employees has been upheld. See, e.g., United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); Ricks v. Department of State Civ. Serv., 200 La. 341, 8 So.2d 49, 59 (1942). However, the government's ability to impose non-discriminatory restrictions on the political activities of its own employees differs significantly from its ability to impose like restrictions on private citizens. Letter Carriers, 413 U.S. at 564, 93 S.Ct. at 2890 (citing Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).
[7] Part (L) of La. R.S. 18:1505.2 addresses campaign finance regulation specific to the gaming industry. The section begins with the following statement of legislative purpose:

The legislature recognizes that it is essential to the operation of effective democratic government in this state that citizens have confidence in the electoral process and that elections be conducted so as to prevent influence and the appearance of influence of candidates for public office and of the election process by special interests, particularly by those persons substantially interested in the gaming industry in this state.
La. R.S. 18:1505.2(L)(1) (emphasis added).
[8] For instance, individuals wishing to contribute to candidates for the State House or Senate, are limited to a $2,500 dollar contribution. La. R.S. 18:1505.2(H)(1)(a)(ii); La. R.S. 18:1483(7). On the other hand, individuals who contribute to candidates for "major" elective offices, such as governor or attorney general, can give no more than $5,000 dollars. La. R.S. 18:1505.2(H)(1)(a)(i); La. R.S. 18:1483(11).
[9] As previously stated, the contribution limits upheld in Buckley applied "broadly to all phases of and all participants in the electoral process." Buckley, 424 U.S. at 12-13, 96 S.Ct. at 631. No one group or industry was targeted, notwithstanding that Congress enacted the statutes at issue in response to egregious examples of quid pro quo abuse committed by specific industries during the 1972 election campaigns. See Buckley, 519 F.2d at 839-40 nn. 36-38 (citing examples from the dairy, dental, oil, and airline industries).
[10] In Soto, a New Jersey appellate court upheld an employee regulation which prohibited any casino officer or key employee from contributing to candidates for public office. Plaintiff alleged that the regulation impermissibly infringed on her First Amendment rights of free speech and association. The Soto court, however, found that "crime and corruption are inherent in the casino industry and that casino gambling is unique." Soto, 565 A.2d at 1104. Further, a state report to the legislature had concluded that "contributions by casino licensees ... give the appearance of attempting to `buy' political influence and favoritism and in fact have the very real potential for causing such favoritism to occur." Id. at 1096. The court concluded that this fear of corruption was the same fear of corruption of the political process relied upon by the Buckley Court. Id. at 1097.

Schiller Park dealt with prohibitions imposed on liquor licensees. The court began its analysis by noting that "the nature of the liquor industry [was] a prime consideration in judging the validity of [the statute at issue]." Schiller Park, 349 N.E.2d at 65. Further, "the business of selling intoxicating liquor is `attended with danger to the community' and is `closely related to certain evils in society.'" Id. Like the Soto court, the court in Schiller Park concluded that these societal concerns were state interests sufficient to uphold the prohibitions in that case. Id. at 66.
[11] It is also important to note that Schiller Park was decided only four months after the Supreme Court handed down Buckley. Thus, the Schiller Park court could easily have interpreted Buckley as a bellwether for the Court's willingness to allow the government increasing regulatory authority in the area of campaign contribution limits. To the contrary, the Court made clear in subsequent cases that Buckley created a "narrow exception." Citizens Against Rent Control, 454 U.S. at 296, 102 S.Ct. at 437.
[12] As one commentator has stated, the level of scrutiny employed by the Buckley Court is difficult to ascertain due to the Court's inconsistent phraseology. James Bopp, Jr., Constitutional Limits on Campaign Contribution Limits, 11 Regent U.L.Rev. 235, 240 (1999). Later in the per curiam opinion, after using the language discussed above, the Court characterized its analysis as "the rigorous standard of review established by [its] prior decisions." Buckley, 424 U.S. at 29, 96 S.Ct. at 640.

Other courts have, however, interpreted the Buckley decision as requiring strict scrutiny analysis. See, e.g., Carver v. Nixon, 72 F.3d 633, 637 (8th Cir.1995), cert. denied, 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996).
[13] In Greater New Orleans Broadcasting Ass'n, Inc. v. United States, 527 U.S. 173, 119 S.Ct. 1923, 1926, 144 L.Ed.2d 161 (1999), the Court addressed the validity of federal statutes that prohibited, some but not all, broadcast advertising of lotteries and casino gambling. Because the statutes affected commercial speech, the Court did not apply strict scrutiny, but instead used the four-part Central Hudson test which does not require the State to demonstrate a compelling state interest. See id. at 1930. Instead, the State must show that: (1) the speech concerns a lawful activity and is not misleading, (2) the asserted governmental interest is substantial, (3) the regulation directly advances the governmental interest asserted, and (4) the regulation is not more extensive than necessary to serve that interest. Greater New Orleans Broadcasting, 527 U.S. 173, 119 S.Ct. at 1930 (quoting Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)).

The government argued that the federal statutes were necessary to reduce the societal ills associated with gambling. However, the Court held that the government could not meet it burden under parts (2) and (3) of the Central Hudson test because the statutes at issue were "so pierced by exemptions and inconsistencies" that the government could not meet its burden. Id. at 1933. Further, because Congress had, in other legislation, sanctioned and approved of gambling, the federal policy disfavoring gambling had become equivocal. Id. at 1932.
[1] The validity of the 1992 statutes legalizing several forms of gambling is not before the court in the present case. I did not get to vote on the issue in Polk v. Edwards, 626 So.2d 1128 (La.1993), because of our temporarily having eight persons on a seven-justice court.
[1] This term is loosely used to encompass those portions of La. R.S. 18:1505.2 declared unconstitutional by the trial court as well as Rule 107 of Title 42 of the Louisiana Administrative Code, which was also declared unconstitutional by the trial court.
[2] The Court concluded that when large contributions are given to current and potential holders of political office in the hopes of securing a political quid pro quo, "the integrity of our system of representative democracy is undermined." Id. at 26-27, 96 S.Ct. at 638. This type of corruption has also been characterized as "a subversion of the political process." FEC v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). This is because elected officials may act contrary to their obligations of office if faced with the prospect of personal financial gain or infusions of large sums of money into their campaigns. Id. "The hallmark of corruption is the financial quid pro quo: dollars for political favors." Id. Similarly, the government was also justifiably concerned with limiting the appearance of corruption so that confidence in our system of representative government is not eroded. Buckley, 424 U.S. at 27, 96 S.Ct. at 638-639. Subsequent to Buckley, the Court has stated that preserving the integrity of the electoral process and preventing corruption are interests of the "highest importance." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 789, 98 S.Ct. 1407, 1422, 55 L.Ed.2d 707 (1978).
[3] In Buckley, the Court cited two cases to illustrate the concept of "different in kind." In one of the cases, Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), the Court addressed the constitutionality of a New York law that required a voter to enroll in the political party of his choice at least 30 days before the general election in November in order to vote in the next subsequent party primary. If a voter failed to meet this deadline, he could not vote in a party primary until after the following general election. In upholding the constitutionality of the challenged law, the Court held that New York did not prohibit petitioners from voting in the primary election or from associating with the political party of their choice; rather, it merely imposed a legitimate time limitation on their enrollment, which they voluntarily disregarded. The Court noted that a person could vote in a different party primary each year as long as he enrolled in a new party between the prior primary and the cutoff date. Thus, it concluded, the law did not "lock a voter into an unwanted pre-existing party affiliation from one primary to the next." Because the law was tied to a legitimate purpose and was "in no sense invidious or arbitrary," the Court upheld the challenged law.

In contrast, the Court in Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), addressed the constitutionality of an Illinois law which prohibited a person from voting in the primary of a political party if he had voted in the primary of any other party within the preceding 23 months. Appellee had voted in a Republican primary in February, 1971 and wanted to vote in a Democratic primary in March, 1972, but was barred from doing so by the 23-month rule. In striking down the law, the Court first observed that the law "substantially restricts" an Illinois voter's freedom to change his political party affiliation. This is because one who wanted to change his party was forced to wait almost two years before his choice would be given effect. The effect of this law was to "lock" the voter into his pre-existing party affiliation for a substantial period of time following his participation in any primary election. The Court noted that although the law did not deprive voters of all opportunities to associate with the political party of his choice, it did absolutely preclude appellant from voting in the Democratic 1972 primary.
In what was later characterized as constituting a case "different in kind" from Rosario, the Court found that unlike the situation presented in Rosario, there was no action appellant could have taken to make herself eligible to vote in the 1972 Democratic primary. This law therefore significantly infringed upon appellant's right of free political association and did not employ the least drastic means to further the state's legitimate interest. Accordingly, the law was declared unconstitutional by the Court.
[4] Although 44 Liquormart is a commercial speech case which deals with a ban on the advertisement of the retail price of alcoholic beverages and, as such, is not directly controlling in a political speech case such as the one before us, I find its rejection of a "vice" exception to First Amendment protections instructive in the instant situation. This is particularly true in light of the fact that basic First Amendment principles, such as the fact that government may not suppress speech as easily as it may suppress conduct, clearly apply to commercial speech, 44 Liquormart, 517 U.S. at 512, 116 S.Ct. at 1512, that a "less than strict standard" is generally applied in commercial speech cases, Id. at 507, 116 S.Ct. at 1510, and that the State may regulate some types of commercial advertising more freely than other types of protected speech. Id. at 498, 116 S.Ct. at 1505. Because the "vice" exception is not allowed in the commercial speech arena, which utilizes a less than rigorous standard of review, I believe such an exception would similarly be disallowed in a case where protected political speech is severely restricted, which must generally withstand more rigorous scrutiny.
[5] These concerns regarding the scope of the laws at issue, combined with the fact that the challenged provisions prohibit only a small segment of persons from expressing their political views through campaign contributions, also raise complex equal protection issues. I leave the resolution of these difficult issues for another day, however, because the conclusion that the laws at issue impermissibly infringe upon protected First Amendment rights is sufficient grounds upon which to invalidate the challenged provisions.
[1] Because of the unusual formation of this opinion, I collectively refer to the per curiam and the concurrences which elaborate upon that ruling as the "Court."
[2] For the fiscal year ending June 30, 1998, the video gaming industry collected $653,375,000 in net gaming proceeds from the devices. For the fiscal year ending June 30, 1997, the industry collected $618,477,000 in net proceeds from the devices.
[3] Police power is "the inherent power of the state to govern persons and things for the promotion of general security, health, morals, and welfare." Polk, 626 So.2d at 1142.
[4] Since Buckley held that "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication," id. at 20, 96 S.Ct. 612, I find that it skirted the question of strict scrutiny and instead applied a balancing test which compared the legislative need for the limitation on political contributions to the degree of burden placed on First Amendment freedoms. Under either test, however, I find the legislative provisions constitutional.
[5] Contrary to the Court's argument, because the statutes prohibit only some, but not all, First Amendment activity and apply to selected, but not all, members of the video poker industry, the Legislature has enacted statutes narrowly tailored to achieve the expressed compelling state interest, thus, satisfying any constitutional strict scrutiny analysis.